UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                     :

NIKE, INC.,                              :
                                     :

                Plaintiff,          :

                                     :          20-CV-1214 (JMF)

          -v-                     :

                                     :        <u>OPINION AND ORDER</u>

B&H CUSTOMS SERVICES, INC., et al.,   :

                                   :

              Defendants.      :

                                   :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      This case raises a question of federal trademark law on which lower courts disagree:

whether a party that unknowingly transports counterfeit goods on behalf of a customer is strictly

liable for trademark infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.*  The question

arises on cross-motions for summary judgment filed by Plaintiff Nike, Inc. and Defendants Shine

Shipping Ltd. ("Shine Shipping") and Shine International Transportation (Shenzen) Limited

("Shine International" and together with Shine Shipping, "Shine") with respect to Shine's

liability for the shipment of counterfeit Nike shoes from China.

      The Court concludes that Shine is not strictly liable for direct trademark infringement

under Sections 1114 and 1125(a) of the Lanham Act, but can be held liable for contributory

infringement if Nike can show at trial that Shine knew or should have known that its customer

was shipping counterfeit goods.  As to Nike's other claims against Shine, the Court holds that its

claim under the Tariff Act for importation of counterfeit goods, 19 U.S.C. § 1526, cannot be

resolved without trial and that its remaining claims — for trademark dilution and importation

under the Lanham Act and for violation of New York common law — fail as a matter of law.

Accordingly, and for the reasons that follow, Nike's motion for summary judgment is DENIED, while Shine's cross-motion for summary judgment is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts, drawn from the admissible materials submitted by the parties in connection with their motions, are undisputed unless otherwise noted.

Nike advertises and sells footwear. *See* ECF No. 66-1 ("Pl.'s SoF") ¶ 1. In connection with its footwear business, Nike owns a number of registered trademarks. *Id.* ¶¶ 2-3.

Shine Shipping and Shine International are foreign non-vessel operating common carriers ("NVOCCs"). *Id.* ¶ 15. NVOCCs do not operate ships directly, but rather arrange for the shipment of goods with vessel operating common carriers ("VOCCs"). *Id.* ¶ 28.

Shine[1] was contacted by a company operating under the name I/O Interconnect, Ltd. ("I/O Interconnect"), located in Guangdong, China, to arrange for a series of shipments from China to the United States between December 2017 and June 2018. *Id.* ¶¶ 36, 39-40. The shipments were purportedly on behalf of a company operating under the name IO Innovative Electronic Co., Ltd. ("IO Innovative"), located in Hong Kong. *Id.* ¶ 39. To arrange the shipments, Shine communicated with an employee of I/O Interconnect named Mark, using the email address mark.hk@iointerllc.com. *Id.* ¶¶ 42-43. Shine was paid for its services in part by a third party, Global Trade International Forwarding Company. *Id.* ¶ 53.

Shine had previously been contacted by I/O Interconnect to arrange a shipment in February 2017. *Id.* ¶ 46. For that shipment, I/O Interconnect asked Shine to list on the house bill of lading ("HBL") — which functions as the contract of carriage between Shine and its customer

---

[1]     Although Shine Shipping and Shine International are discrete entities, the parties generally refer to them collectively as "Shine." The Court will follow their lead.

— I/O Interconnect as both the shipper in China and the consignee, or receiver of the goods, in the United States. *Id.* ¶¶ 21, 48.  Shine was informed by its agent in California that I/O Interconnect could not act as the consignee because I/O Interconnect did not do business in the United States. *Id.*  I/O Interconnect then asked Shine to list "Jetway Corp." as the consignee. *Id.* ¶ 49.  According to Nike, "Jetway Corp." is a fraudulent company name. *Id.* ¶ 50.

For the five shipments on behalf of IO Innovative, the HBL listed Zhong Wang Lighting Factory as the Chinese shipper and "Artiva" as the United States consignee receiving the shipments. *Id.* ¶¶ 36, 52.  The contents of each shipment were listed as lamps. *Id.* ¶ 64.  Shine contends that I/O Interconnect provided this information for each shipment.  ECF No. 74 ("Defs.' Resp.") ¶¶ 52, 64.

For the first two shipments, Shine contracted with K-Line America, Inc. ("K-Line"), a VOCC.  Pl.'s SoF ¶ 67.  K-Line issued a master bill of lading ("MBL") — a contract of carriage between the VOCC and its customer — identifying Shine as the Shipper and Hana Freight LLC d/b/a Hana International Logistics ("Hana") as the consignee. *Id.* ¶¶ 7, 67-68.  Hana is a U.S.-licensed NVOCC that acts as Shine's receiving agent for some shipments, including the five IO Innovative shipments. *Id.* ¶¶ 86-87, 91.  Shine "issued credit notes to Hana" to pay for its services.  Defs.' Resp. ¶ 116.

For the last three shipments, Shine contracted with another NVOCC, CTS Global Supply Chain Solutions ("CTS Global"), to arrange shipping with VOCC Maersk Line A/S ("Maersk"). *Id.* ¶¶ 69, 70.  CTS Global issued an HBL listing Shine as the shipper and Hana as the consignee. *Id.* ¶ 69.  Maersk then issued an MBL listing CTS Global as both the shipper and the consignee. *Id.* ¶ 70.  Shine contends that issuing bills of lading "back-to-back" when multiple NVOCCs are

involved in shipment is common, so that the liabilities governed by the bill of lading are passed from one entity to another. Defs.' SoF ¶ 45. Shine paid CTS for its services. Defs.' Resp. ¶ 74.

As part of the U.S. customs process for each of the five shipments, Automated Manifest System filings ("AMS") and Import Security filings ("ISF") were made, as required. Pl.'s SoF ¶¶ 75, 78. The AMS describes the goods to be shipped and must be filed before the goods may be transported to the United States; an ISF is filed by a customs broker on behalf of the importer of the goods and contains a number of pieces of information, including a description of the goods. Defs.' SoF ¶¶ 60, 62-65. According to Shine, it did not make any of the filings for the IO Innovative shipments, but obtained information for the filings, including that the five shipments consisted of lamps, from I/O Interconnect and passed that information along to the relevant parties. Defs.' Resp. ¶¶ 75, 78, 100. Shine also forwarded the HBLs and contact information it was provided by I/O Interconnect for "Artiva," the supposed consignee, including the email address tom@artivallc.com, to Hana, to facilitate the filing of the ISFs. *Id.* ¶¶ 101, 122. Shine invoiced I/O Interconnect $35 for services related to the filing of the ISF for the seized shipment; according to Shine, that fee was passed directly to Hana. *Id.* ¶¶ 85, 117. Shine was also paid $30 for passing along information related to the ISF filing. *Id.*

For each shipment, Hana contracted with B&H Customs Brokerage Services, Inc. ("B&H") to act as customs broker. *Id.* ¶ 107. Hana communicated with Tom Lee, the putative president of Artiva, using the email address provided by Shine. Pl.'s SoF ¶ 106. Hana obtained a customs power of attorney from Lee for B&H to use, which was returned in the name of "Artiva USA Inc." B&H then filed customs paperwork for the shipments in the name of E-Ko Image, Inc. d/b/a Artiva ("E-Ko"), not "Artiva USA Inc." *Id.* ¶¶ 113, 118-19. Nike posits that the "likely explanation" for the change is that the form returned by Lee "utilized the Federal Tax

ID# for E-Ko Image, Inc." and that "[w]hen B&H fil[l]ed out the entry document, like most customs brokers, it used the Federal Tax ID# to automatically prefill the entry document in with all of the entity information related to Federal Tax ID # already on file with Customs."  ECF No. 68 ("Pl.'s Mem."), at 12 n.6; *see also* ECF No. 76 ("Pl.'s Resp. to Supp. SoF") ¶ 17.

On November 29, 2019, Customs and Border Protection seized the fifth shipment arranged by Shine after it was found to contain counterfeit Nike shoes.  *Id.* ¶¶ 7, 36.  Thereafter, Nike determined that E-Ko, a company located in California, did not authorize or have knowledge of the shipments; that "Tom Lee" is not employed by E-Ko; and that the domain listed for "Lee's" email is not E-Ko's authentic domain name.  *Id.* ¶¶ 51, 103-05, 111.

Shine contends that it "did not learn that the shipment at issue contained counterfeit goods until after Customs seized it" and that it "did not know that the name of the shipper and consignee it had been provided by its customer was inaccurate at the time of the shipment."  ECF No. 73 ("Defs.' Supp. SoF") ¶¶ 17, 28.  Nike disputes this and argues that Shine was "on constructive notice that there was a problem with identity theft" concerning the consignee, "Artiva," because, for the first shipment, Hana received from "Artiva," via Tom Lee, a customs power of attorney in the name of Artiva USA, Inc. that utilized the federal tax ID number of E-Ko, which resulted in B&H listing E-Ko on the entry documents it filed.  Pl.'s Resp. to Supp. SoF ¶ 17; Pl.'s Mem. 12 n.6.  Nike further contends that Shine had "actual notice" of "problems" with IO Innovative as a client because it was represented by a third party, I/O Interconnect, which had previously tried to import goods to the United States in its own name.  Pl.'s Resp. to Supp. SoF ¶ 17.

Nike filed suit against Shine, Hana, and B&H, alleging claims under the Lanham Act, the Tariff Act of 1930, and New York law.  ECF No. 32 ("Compl.").  B&H and Hana were later

dismissed as defendants following the Court's entry of stipulated permanent injunctions as to each.  ECF Nos. 38, 50.  Shine now moves for summary judgment as to liability on all counts.  ECF No. 63.  Nike cross-moves for summary judgment as to liability and for a finding that it is entitled to a presumption of willfulness on its Lanham Act claims.  ECF No. 66.

## LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23).

Where both sides move for summary judgment, as here, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it."  *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).  "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Id*. (internal quotation marks omitted).  To defeat a motion for summary judgment, the non-moving party

must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

## DISCUSSION

Nike alleges claims under the Lanham Act, the Tariff Act, and New York state law.  The Court, like the parties, will focus most of its attention on the question of whether an entity involved in transporting goods is strictly liable for direct infringement under Sections 1114 and 1125(a) of the Lanham Act.  But because the parties' cross-motions for summary judgment are brought with respect to all claims, the Court will address each claim in turn.

### A.  Lanham Act Claims

The Court begins with Nike's claims under the Lanham Act: for trademark counterfeiting, infringement, and unfair competition pursuant to 15 U.S.C. §§ 1114 and 1125(a); for dilution pursuant to 15 U.S.C. § 1125(c); and for importation of counterfeit goods pursuant to 15 U.S.C § 1124.  After addressing each claim, the Court turns to Nike's argument that it is entitled to a presumption of willfulness pursuant to 15 U.S.C. § 1117(e).

#### 1.  Trademark Counterfeiting, Trademark Infringement, and Unfair Competition

In Counts I, II, III, and V of its complaint, Nike alleges trademark counterfeiting and infringement, unfair competition, and false designation of origin under Sections 1114 and 1125(a) of the Lanham Act.  *See* Compl. ¶¶ 89-105, 111-14.  Section 1114 provides in relevant part:

> Any person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant.

15 U.S.C. § 1114.  Section 1125(a), in turn, provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*Id.* § 1125(a)(1).

To establish a claim under either provision for direct infringement, a plaintiff must show "that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale[, offering for sale, distribution,] or advertising of goods or services, 15 U.S.C. § 1114(a)(1), (5), without the plaintiff's consent." *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005) (internal quotation marks omitted).  "In addition, the plaintiff must show that defendant's use of that mark is likely to cause confusion as to the affiliation, connection, or association of defendant with plaintiff, or as to the origin, sponsorship, or approval of the defendant's goods, services, or commercial activities by plaintiff." *Id.* (cleaned up).  Significantly, "[b]ecause the Lanham Act is a strict liability statute, a registrant need not prove knowledge or intent in order to establish liability." *Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 421 (S.D.N.Y. 2018).

Here, Nike contends that Shine "used" Nike's mark "in commerce" when it arranged for transportation of the counterfeit goods.  In support of this argument, it points to Section 1127 of the Lanham Act, which defines "[t]he term 'use in commerce'" to mean

> the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce –
>
> (1) on goods when –
>
> > (A)  it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
> >
> > (B)  the goods are sold *or transported in commerce*, and
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127 (emphasis added).

The Second Circuit addressed the import of this provision in *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123 (2d Cir. 2009).  After examining the Lanham Act's legislative history and observing that Section 1127's reference to "bona fide use" makes little sense in the context of infringement, the Court expressed doubt about whether the definition was intended to apply to Sections 1114 and 1125(a), governing infringement, rather than solely to provisions of the Act governing *registration* of trademarks.  *See* 562 F.3d at 131-41 (citing S. Rep. 100-515, at 45 (1988) (explaining that "the revised definition [of 'use in commerce'] is intended to apply to all aspects of the trademark registration process" but that "[c]learly, . . . use of any type will continue to be considered in an infringement action")).  Nevertheless, mindful that Congress "enacts statutes" and "not . . . intentions," the Second Circuit ultimately concluded that at least

"the requirements of the second sentence of the definition of 'use in commerce' in [Section] 1127 apply to infringing conduct."  *Id.* at 139-40; *see also Can't Live Without It, LLC v. ETS Express, Inc.*, 287 F. Supp. 3d 400, 415 (S.D.N.Y. 2018) (concluding that courts in the Second Circuit are required to apply the second sentence of the definition in Section 1127 even though it is "'plainly apparent from context' that [it] does not apply to infringement claims"). Accordingly, the Court must apply Section 1127's definition of "use in commerce" (other than the first sentence, regarding "bona fide use") here.

Applying this definition, Nike argues that because "use in commerce" explicitly includes goods that are *sold or transported*," the Lanham Act creates strict liability for *transporters* of counterfeit goods such as Shine — even where the transporters do not sell the counterfeit goods and do not know what they are transporting.  Pl.'s Mem. 18-19.  Shine, in turn, contends that the Lanham Act does not create strict liability for a defendant that merely transports, without knowledge, counterfeit goods on behalf of a customer.  ECF No. 72 ("Defs.' Opp'n"), at 1-2. Shine makes two arguments in support of its position.  First, Shine argues that claims under Sections 1114 and 1125(a) require that a defendant "use" a plaintiff's mark in commerce in connection with its own goods and services and that, even if mere transportation constitutes "use," the transportation here was not in connection with Shine's goods or services.  *Id.* at 9-14. Second, Shine argues that holding transporters strictly liable would run counter to the theory of contributory infringement adopted by the Supreme Court in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 (1982), which found that a distributor or manufacturer is liable for infringement of its customers only if it induces the customer to infringe or knows or should know about the infringement.  ECF No. 64 ("Defs.' Mem."), at 8-9.  The Court finds both points

persuasive and concludes that Shine is not directly liable under Sections 1114 or 1125(a) of the
Lanham Act.

As to the first point, Section 1114 makes clear that liability for infringement attaches only
where the "use in commerce" is "in connection with the sale, offering for sale, distribution, or
advertising of goods or services." 15 U.S.C. § 1114. Here, even assuming that Shine's role in
arranging for transportation of the goods otherwise constitutes "use," it is undisputed that Shine
had no intention of selling, distributing, or advertising the counterfeit goods. *See* ECF No. 66-2
("Pl.'s Resp.") ¶ 35 ("[a]dmitt[ing]" that "Shine did not . . . sell or attempt to sell the goods");
Pl.'s Mem. 32 ("Nike does not allege that Shine's advertising . . . is a part of this case.").
Because Shine did not "use" Nike's mark "in connection with the sale, offering for sale,
distribution, or advertising of goods or services," there can be no direct liability. 15 U.S.C.
§ 1114. Importantly, that reading does not render the words "or transportation" in Section 1127
superfluous. Instead, the statute creates liability when only transportation, and not a sale, is
shown, so long as the defendant intends to sell, advertise, or distribute the goods. *See, e.g.*,
*Philip Morris USA, Inc. v. Lee*, 481 F. Supp. 2d 742, 747 (W.D. Tex. 2006) (holding a defendant
liable for direct infringement on a transportation theory where the defendant had "arranged for
the importation of a substantial quantity of counterfeit Marlboro cigarettes, which he intended to
distribute to consumers who would mistake them for legitimate Marlboros").

Although Section 1125(a) does not include the phrase "in connection with the sale,
offering for sale, distribution, or advertising of goods or services," it is plain that the same
analysis applies. First, it is well-established that claims under Sections 1114 and 1125(a) are
treated the same. *See 1-800 Contacts, Inc.*, 414 F.3d at 406-07; *Born to Rock Design Inc. v.
CafePress.com, Inc.*, No. 10-CV-8588 (CM), 2012 WL 3954518, at *3 (S.D.N.Y. Sept. 7, 2012);

Pl.'s Mem. 16 ("Court[s] analyze claims under 15 U.S.C. § 1125 using the same standard they do for infringement of registered marks.").  Second, Section 1125(a) provides that the "use" must be "in connection with any goods or services" and that there must be a likelihood of confusion "as to the origin, sponsorship, or approval of" *the infringer's* "goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(A).[2]  That language, like the language in Section 1114, makes plain that the infringer must have some intention to sell, advertise, or distribute the infringing product or service in order for strict liability to attach.  Mere unwitting transportation of another's goods is not enough under the language of either provision.

As to the second point, in *Inwood Laboratories*, the Supreme Court adopted a doctrine of "contributory infringement," pursuant to which a manufacturer or distributor is liable if it "intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement."  456 U.S. at 854.  In *Inwood*, the plaintiff, the maker of a drug, sought to hold the defendant, who made a generic version of the same drug, liable when pharmacies dispensed the generic drug under the name of the non-generic drug.  The Court concluded that the defendant was not liable, however, because the plaintiff could not show that the defendant intentionally induced the pharmacies to mislabel its drug or continued to supply the drug to pharmacists whom the defendant knew were mislabeling the drug.  *Id.* at 855-56.  The Second Circuit has since explained that, although "*Inwood*'s test for contributory trademark infringement applies on its face to manufacturers and

---

[2]    Nike argues that the mere fact that the goods were counterfeit, *without more*, establishes a "likelihood of confusion" sufficient to satisfy Section 1125(a).  Pl's Mem. 17 (citing *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 596-97 (S.D.N.Y. 2010)).  But as the case Nike itself cites in its brief makes clear, "[t]o find a likelihood of confusion," a court must determine both "that the items at issue are counterfeit *and* that the defendant "*distributed, offered for sale, or sold the items*."  *Fendi Adele S.R.L*, 689 F. Supp. 2d at 597 (emphasis added).

distributors of goods," courts "have . . . extended the test to providers of services." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 104 (2d Cir. 2010); *see also Slep-Tone Ent. Corp. v. Golf 600 Inc.*, 193 F. Supp. 3d 292, 296 (S.D.N.Y. 2016) (holding that *Inwood Laboratories* applies to "providers of services").  As Shine points out, it would make little sense to hold mere *transporters* strictly liable under the Lanham Act based on infringement committed by their customers when other service providers are liable only if they "induce[] another to infringe a trademark or know or have reason to know" their customers are engaging in trademark infringement.  Defs.' Mem. 9.

For both of these reasons, the Court is persuaded that transporters are not strictly liable for direct infringement under Sections 1114 and 1125(a) where they unwittingly transport counterfeit goods for a customer.  That said, they may be held liable on a contributory infringement theory if the plaintiff proves that they knew their customers were dealing in infringing goods or they induce their customers to do so.  *See Tiffany*, 600 F.3d at 103 (2d Cir. 2010) ("E-Bay's knowledge *vel non* that counterfeit Tiffany wares were offered through its website is relevant to the issue of whether eBay contributed to the direct infringement of Tiffany's mark by the counterfeiting vendors themselves . . . [b]ut it is not a basis for a claim of direct trademark infringement against eBay.").  That reading of Sections 1114 and 1125(a), in addition to being consistent with the plain text of the provisions and Supreme Court precedent on contributory liability, is also supported by strong policy arguments.  As Shine points out, holding transporters, including VOCCs, strictly liable for the contents of every container they transport risks crippling the container shipping industry.  Defs.' Mem. 10.

Nike offers several arguments in support of its contrary reading of Sections 1114 and 1125(a), but they are unpersuasive.  First, Nike cites a number of cases for the proposition that

"use in commerce in the context of a trademark means that the goods are sold or transported in commerce" and "[t]he 'or transport' language of 15 U.S.C. § 1127 makes it clear that a 'use in commerce' is not limited to sales."  Pl.'s Mem. 18.  But several of these cases discuss the definition of "use in commerce" in the context of trademark *registration*, not infringement.  Accordingly, these courts did not apply the portions of Sections 1114 and 1125(a), discussed above, providing that the use in commerce must be "in connection with the sale, offering for sale, distribution, or advertising of goods or services," or that there must be a likelihood of confusion "as to the origin, sponsorship, or approval of" *the infringer's* "goods, services, or commercial activities."  *See New England Duplicating Co. v. Mendes*, 190 F.2d 415, 417 (1st Cir. 1951) (discussing "use in commerce" in the context of the validity of the plaintiff's registration); *Mod. Grp. v. Tiger Env't & Rental Servs., LLC*, 640 F. Supp. 2d 820, 825 (W.D. La. 2009) (same); *see also Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 855 (9th Cir. 2002) (addressing a claim for infringement but reasoning that "the 'or transported' language of 15 U.S.C. § 1127 makes it clear that a 'use in commerce' under the Lanham Act is not limited to sales" because "[t]he sending of a product from Los Angeles to New York with its label attached so that its trademark could be registered has been considered transportation in commerce").  Nike itself makes little effort to argue in its briefs that Shine's alleged "use in commerce" was "in connection with the sale, offering for sale, distribution, or advertising of goods or services."  *See, e.g.*, ECF No. 75 ("Pl.'s Reply"), at 3 ("Applying the plain language of 15 U.S.C. § 1127 to these undisputed facts, Shine's participation in the transportation and importation of the Counterfeit Nike Footwear falls squarely within the statutory definition of 'use in commerce.' Shine is therefore directly liable for infringement under the Lanham Act as a matter of law.").

Further, in many of the cases Nike cites that *do* address transportation in the context of infringement, the alleged infringer transported the goods and then sold them, or intended to sell them, clearly satisfying the statutory requirements of Sections 1114 and 1125(a).  *See Born to Rock Design Inc.*, 2012 WL 3954518, at *4 ("[I]t is undisputed that [Defendant] imprints the [infringing] designs on merchandise and ships that merchandise to customers.  That activity constitutes 'use in commerce.'" (citation omitted)); *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 154 (E.D.N.Y. 2016) ("There is no dispute that plaintiffs have established Defendants' involvement in the transportation and sale of counterfeit [goods]."); *Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.*, No. 08-CV-0068 (KAM) (JO), 2010 WL 2133937, at *1 (E.D.N.Y. Mar. 11, 2010) (entering a default judgment based on the plaintiff's allegation that the "defendants [had] arranged for and imported the shipment as part of an ongoing scheme to import, distribute, and sell counterfeit cigarettes"), *report and recommendation adopted*, 2010 WL 2160058 (E.D.N.Y. May 27, 2010).

Even in the cases Nike cites where defendants engaged in transportation without selling the counterfeit goods, the defendants did more than merely transport those goods.  In *Abbott Laboratories v. Adelphia Supply USA*, No. 15-CV-5826 (CB) (ALB), 2019 WL 5696148 (E.D.N.Y. Sept. 30, 2019), for example, the Court noted that "[w]hether a non-seller can be held directly liable for trademark infringement is less clear," but concluded that two of the relevant defendants were nonetheless liable because they each "plainly" participated in the sale of infringing goods.  *Id.* at *6-8.  As to the third relevant defendant, the customs broker, the Court concluded that he was also liable because his "role extended beyond th[e] . . . signing of customs forms" to "arrang[ing] for clearance, deliver[ing] goods to [the custom's broker's] warehouse, and confirm[ing] the count of the stock."  *Id.* at *9; *see also BMW of N. Am., LLC v. WIN.IT Am.,*

*Inc.*, No. 17-CV-8826 (PSG), 2019 WL 926326, at *3-4 (C.D. Cal. Jan. 25, 2019) (denying the defendant's motion for summary judgement because there was a genuine dispute of fact as to whether the defendant had personally imported and further distributed within the United States the infringing goods); *Philip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119, 1122-23 (C.D. Cal. 2007) (granting the plaintiff's motion for summary judgement where the defendant had "unload[ed] and transport[ed] counterfeit cargo" and "willfully blinded himself to facts that would put him on notice that he was infringing another's trademarks").  This Court need not decide whether it agrees with the analysis in those cases, because the facts here are clearly distinguishable: Shine did not unload, store, confirm the count of, or otherwise distribute the counterfeit goods.  Nor did it act as the customs broker for the shipment.

Finally, to the extent that Nike cites decisions that do allege similar facts, this Court declines to follow them.  In *Nike, Inc. v. Eastern Ports Custom Brokers, Inc.*, No. 2:11-CV-4390 (CCC), 2018 WL 3472628 (D.N.J. July 19, 2018), for example, the Court concluded that two NVOCCs and the customs broker for a shipment were liable for direct trademark infringement and counterfeiting, despite allegedly being unaware that they were shipping counterfeit goods. *Id.* at *5, *8.  But there, the Court focused solely on the definition of "use in commerce" in Section 1127, without considering whether Defendants had used the counterfeit goods "in connection with the sale, offering for sale, distribution or advertising" of the goods, as required by Sections 1114 and 1125(a).  *See id.* at *5-8.  The same was true in *Nike, Inc. v. KAL Am., Inc.*, No. 15-CV-5269 (GW), 2016 U.S. Dist. LEXIS 141266 (C.D. Cal. May 2, 2016).  In that case, two defendants, a customs broker and an NVOCC, moved to dismiss Nike's claim of direct trademark infringement.  The Court denied the motion, concluding that they had "use[d]" the mark "in commerce" by "participa[ting] in the transportation of the goods in question," but

failing to consider whether such "use" was "in connection with the sale, offering for sale, distribution or advertising" of the goods.  *Id.* at *7-8.  Lastly, at least one district court has reached a conclusion consistent with this Court's on similar facts.  In *Coach, Inc. v. Celco Customs Servs. Co.*, No. 11-CV-10787 (MMM), 2013 WL 12122691 (C.D. Cal. Jan. 28, 2013), the Court granted the defendants' motion to dismiss, concluding that the plaintiff had failed to adequately allege "use" because, although "defendants formally entered the shipment of counterfeit . . . goods into the country," the "complaint d[id] not allege that defendants used any of Coach's registered marks in the course of completing the entry paperwork, nor that they displayed the Coach marks in marketing or selling their services to importers."  *Id.* at *1, *6.  In short, the Court is not persuaded by the decisions Nike cites that unknowing involvement in the transportation of another's counterfeit goods is sufficient to establish liability for direct infringement.

Nike also argues that the Second Circuit's decision in *El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir. 1986), shows that a defendant need not be "involved in the manufacture nor the affixing of the relevant trademark to the" counterfeit product for it to be liable and, further, that a "defendant's claimed lack of knowledge of its supplier's infringement, even if true, provides no defense."  Pl.'s Reply 2 (internal quotation marks omitted).  True enough.  In *El Greco*, the Court concluded that a store had infringed on the trademark of a shoe manufacturer because it sold counterfeits of the manufacturer's shoes.  806 F.2d at 396.  The store argued that the shoes were genuine in that they were part of a discontinued order of genuine shoes cancelled by the manufacturer.  *Id.*  The Court rejected that argument and concluded that the store was liable even though it "was involved neither in the manufacture nor the affixing of the . . . trademark to the shoes."  *Id. El Greco*, however, offers little guidance here.  The dispute

in that case was about whether the shoes were counterfeit, *see id.* at 395-96; once the Court concluded that they were, it was clear that the store had "use[d] [the trademark affixed to the shoes] in commerce . . . in connection with the[ir] sale" by *selling* the shoes, *id.* at 396. Not so with Shine here. Shine is not liable for direct infringement because it did not use Nike's mark "in connection with the sale, offering for sale, distribution, or advertising of goods or services." Accordingly, the Court grants Shine summary judgment on that point.

That conclusion does not, however, foreclose a finding of liability based on a theory of *contributory* infringement — that is, on a theory that Shine knew or should have known that its customer was shipping counterfeit goods. Shine does not dispute that an entity involved in transporting goods to be sold by another entity could be held liable under such a theory. Defs.' Mem. 8-9, 16. It merely contends that Nike does not plead a claim of contributory infringement in its Complaint. *See id.* at 8-9, 15 n.4; Defs.' Opp'n 17, 22. But that is wrong. Although Nike relies primarily on a direct-infringement theory in its brief, *see* Pl.'s Mem. 2-3, Nike does also plead contributory infringement, *see* Compl. ¶ 88; Pl.'s Mem. 29 n.11, 33-34. In fact, Nike's own theory of this case fits much better with a claim for contributory infringement than it does with a claim for direct infringement. Nike argues that it is pursuing NVOCCs like Shine because "counterfeit footwear is smuggled into the United States through the use of ocean transportation companies who move and import the goods in the name of legitimate U.S. companies without such companies' authorization or knowledge" and that these "illicit smuggling schemes are possible only with the active cooperation or, at the very least, the willful blindness of the transportation and importation entities involved." Pl.'s Mem. 1-2. Contributory infringement, as described above, creates liability in just such circumstances, where a service provider "knows or

has reason to know" that its customer is using its service to engage in trademark infringement.

*Inwood*, 456 U.S. at 854.

Indeed, the Second Circuit has long held that the knowledge requirement for contributory infringement is satisfied where the defendant "ha[s] reason to suspect that counterfeit . . . goods" are being sold using its service and "intentionally shielded itself from discovering" the identity of customers engaged in counterfeiting. *Tiffany*, 600 F.3d at 109.[3]  Most recently, the Court expanded on this "willful blindness" test, explaining that

> a defendant may be held liable for contributory trademark infringement despite
> not knowing the identity of a specific vendor who was selling counterfeit goods,
> as long as the lack of knowledge was due to willful blindness. . . .  [W]here a
> defendant knows or should know of infringement, whether that defendant may be
> liable for contributory infringement turns on what the defendant does next.  If it
> undertakes bona fide efforts to root out infringement, . . . that will support a
> verdict finding no liability, even if the defendant was not fully successful in
> stopping infringement.  But if the defendant decides to take no or little action, it
> will support a verdict finding liability.

*Omega SA v. 375 Canal, LLC*, 984 F.3d 244, 254-55 (2d Cir. 2021).  In *Omega*, the defendant was the owner of a property.  *Id.* at 248.  Several times over the years, the owner was sued after brands discovered venders on the premises selling counterfeit goods.  *Id.*  The plaintiff, a watchmaker, sued the owner again for contributory infringement after it refused to take other steps to prevent counterfeiting.  *Id.* at 249.  On appeal, the owner argued that it should not have been held liable because the watchmaker failed to identify a specific vendor that the owner knew was counterfeiting.  *Id.* at 250.  The Court disagreed, concluding that the plaintiff had "introduced evidence from which a jury could find that [the defendant] had a history of turning a

---

[3]    Some courts have concluded that for a service provider to be found liable on a theory of contributory infringement, the provider must "exercise sufficient control over the means of the infringing conduct."  *Slep-Tone Ent. Corp.*, 193 F. Supp. 3d at 296 (internal quotation marks omitted).  Shine does not make that argument here and, thus, has forfeited it.

blind eye toward counterfeiting at [the property] and that [it] had taken insufficient steps to root out the counterfeiting it knew or should have known was occurring." *Id.* at 244-45.

Here, Nike similarly alleges that Shine was "on constructive notice that there was a problem with identity theft" concerning the consignee, "Artiva," because, for the first shipment, Hana received from "Artiva" a customs power of attorney in the name of Artiva USA, Inc. that utilized the federal tax ID number of E-Ko and that Shine had "actual notice" of "problems" with IO Innovative as a client because it was represented by a third party, I/O Interconnect, that had previously tried to import goods to the U.S. in its own name. Pl.'s Resp. to Supp. SoF ¶ 17. Shine disputes these claims, contending that it "did not learn that the shipment at issue contained counterfeit goods until after Customs seized it" and that it "did not know that the name of the shipper and consignee it had been provided by its customer was inaccurate at the time of the shipment." Defs.' Supp. SoF ¶¶ 17, 28. These competing allegations raise a genuine dispute of material fact. Accordingly, summary judgment must be and is denied to both parties on the issue of contributory infringement.

### 2. Dilution

Count IV alleges a claim for dilution under the Lanham Act, pursuant to 15 U.S.C. § 1125(c). *See* Compl. ¶¶ 106-10. To state a claim for dilution, a plaintiff must show that "(1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 449 (2d Cir. 2004). "One of the key distinctions between trademark infringement and trademark dilution is that the anti-dilution statutes provide more expansive protection than trademark infringement claims [because]

trademark dilution can be found even when the defendant's goods are in a wholly different area of commerce than plaintiff's goods, and thus do not cause any likelihood of confusion." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 522 n.44 (S.D.N.Y. 2008), *aff'd in part*, *rev'd in part*, 600 F.3d 93 (2d Cir. 2010).  The Lanham Act creates liability for two types of dilution, both of which Nike alleges here: blurring and tarnishment.  "Dilution by blurring is an association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark," including, for example, "hypothetical anomalies [like] Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth." *Tiffany*, 600 F.3d at 111 (internal quotation marks omitted).  "[D]ilution by tarnishment," on the other hand, "is an association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark, . . . generally . . . when the plaintiff's trademark is linked to products of shoddy quality." *Id.* (internal quotation marks omitted).

Critically, both types of dilution require a showing that "*the defendant* is making commercial use of the mark in commerce." *Savin Corp.*, 391 F.3d at 449 (emphasis added).  In *Tiffany*, jewelry maker Tiffany sought to hold eBay liable for dilution because counterfeit Tiffany products were sold on eBay's online marketplace.  600 F.3d at 112.  The Court rejected that claim, concluding that eBay had no liability for dilution "because eBay has never used the Tiffany Marks to refer to eBay's own product" and "eBay did not itself sell the goods at issue." *Id.* (cleaned up).  The same is true here.  Nike argues that "Shine's arranging the transportation and importation of the Counterfeit Nike Footwear demonstrates Shine's commercial use of the mark," Pl.'s Mem. 23, but that is insufficient to state a claim for dilution.  Nike cites in support *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585 (S.D.N.Y.

2010), but the defendant there, unlike Shine here, was itself *selling* the counterfeit products at issue, *see id.* at 598.  Shine, by merely transporting counterfeit goods, did not make "commercial use of the mark" in a way that could "dilute[] the quality of the mark."  *See Tiffany*, 600 F.3d at 112 ("Tiffany argues that counterfeiting dilutes the value of its product.  Perhaps.  But insofar as eBay did not itself sell the goods at issue, it did not itself engage in dilution.").  Accordingly, the Court grants Shine's motion as to Count IV.

### 3.  Importation of Counterfeit Goods

Next, Count VI alleges a claim for importation of counterfeit goods under Section 1124 of the Lanham Act.  *See* Compl. ¶¶ 111-14.  That claim fails, however, because there is no private cause of action under Section 1124.  Indeed, on its face, Section 1124 is directed not to trademark owners, but to U.S. Customs officials.  For example, it states that "no article of imported merchandise . . . which shall copy or simulate a [registered] trademark . . . *shall be admitted to entry at any customhouse* of the United States" and provides further safeguards "in order to aid *the officers of the customs in enforcing this prohibition*."  15 U.S.C. § 1124 (emphasis added).  Moreover, unlike other provisions of the Lanham Act, Section 1124 makes no reference to civil liability.  *Cf.* 15 U.S.C. § 1114(1) (violator "shall be liable in a civil action by the registrant for the remedies hereinafter provided"); *id.* § 1125(a) (violator "shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act"); *id.* § 1125(c)(1) (owner of mark "shall be entitled to an injunction against another person who" dilutes the mark).

Some courts have nonetheless found that Section 1124 provides a private cause of action. *See, e.g.*, *Phillip Morris USA Inc. v. Marlboro Express*, No. 03-CV-1161 (CPS), 2005 U.S. Dist. LEXIS 40359, at *17 (E.D.N.Y. Aug. 26, 2005); *Philip Morris USA. Inc.*, 481 F. Supp. 2d at

748; *Philip Morris USA Inc. v. Lee*, 549 F. Supp. 2d 839, 849 (W.D. Tex. 2008).  As one court in this district explained, albeit in dicta, "while 15 U.S.C. § 1124 does not itself provide a remedy to the holders of infringed trademarks, 15 U.S.C. §§ 1116 and 1117 authorize injunctive relief and damages, respectively, for a 'violation of any right of the registrant of a mark registered in the Patent and Trademark Office'" which could be interpreted to extend liability to Section 1124. *Akhenaten v. Najee, LLC*, 544 F. Supp. 2d 320, 325 n.4 (S.D.N.Y. 2008).  At least one other court has reached the opposite conclusion, finding that there is no private cause of action under Section 1124.  *See Coach, Inc.*, 2013 WL 12122691, at *11.

The Court is persuaded that the latter approach is the right one.  Section 1124 provides only that a "manufacturer or trader" may "record[]" with the Department of Treasury a trademark, "in order to aid the officers of the customs in enforcing th[e] prohibition" on importation of counterfeit goods.  15 U.S.C. § 1124.  By its terms, therefore, it does not create any "right" that would justify applying the injunctive relief and damages provisions in Sections 1116 and 1117.  *See Coach, Inc.*, 2013 WL 12122691, at *11 ("[Section] 1124 does not create any rights for registrants of trademarks other than the right to record their marks . . . .  Rather, the provision outlines the duties of customs officers.").  And, as described above, the text does not include any other provision creating civil liability, as other sections of the Lanham Act do.  For all these reasons, the Court is persuaded that Section 1124 does not create a private right of action.  On top of that, Nike's Tariff Act claim for importation of counterfeit goods, for which there clearly *is* a private right of action, *see infra*, provides the same relief that would otherwise be available under Section 1124.  *See John Wiley & Sons, Inc. v. Book Dog Books, LLC*, No. 13-CV-816 (WHP) (GWG), 2015 WL 5724915, at *20 (S.D.N.Y. Sept. 30, 2015) (concluding that the court "need not address whether plaintiffs have a private cause of action under 15 U.S.C. §

1124 . . . because plaintiffs have a private cause of action under 19 U.S.C. § 1526"), *report and recommendation adopted in relevant part*, 2016 WL 11468565 (S.D.N.Y. Mar. 29, 2016). Accordingly, the Court dismisses Nike's claim pursuant to Section 1124, both because that provision does not provide a private right of action and because it is duplicative of Nike's Tariff Act claim.

### 4. Presumption of Willfulness

Finally, Nike also moves for summary judgment on the question of whether it is entitled to a presumption of willfulness, pursuant to 15 U.S.C. § 1117(e), which is relevant to calculating damages for its Lanham Act claims under Sections 1114, 1125(a), and 1125(c).  *See* 15 U.S.C. § 1117(a)-(c).  Section 1117(e) provides for "a rebuttable presumption that the violation is willful . . . if the violator, or a person acting in concert with the violator, knowingly provided or knowingly caused to be provided materially false contact information to a domain name registrar, domain name registry, or other domain name registration authority in registering, maintaining, or renewing a domain name used in connection with the violation."  15 U.S.C. § 1117(e).  Courts have applied the presumption where, for example, the defendant "provided updated contact information for maintaining [the plaintiff's] domain name" and "had [the plaintiff's] domain name diverted to [the defendant's] domain name."  *Translucent Commc'ns, LLC v. Ams. Premiere Corp.*, No. 08-CV-3235 (WGC), 2010 WL 723937, at *21 (D. Md. Feb. 24, 2010); *see also Int'l Typeface Corp. v. Shellabarger*, No. 06-CV-0260 (HLM), 2008 WL 11333693, at *8 (N.D. Ga. June 30, 2008) (applying the presumption where the defendant "provid[ed] false contact information to his domain name registrar, . . . ma[king] himself inaccessible to . . . [the plaintiffs'] efforts to notify him of trademark infringement").

Nike argues that the elements of Section 1117(e) are met here because the website of I/O Interconnect, Shine's client, lists the same contact phone number in its domain name registration as the website used by "Artiva," the supposed consignee of the counterfeit goods.  Pl.'s SoF ¶¶ 103-04.  Nike argues that this fraudulent contact information was clearly provided by I/O Interconnect in creating the websites and that Shine was "working in concert" with I/O Interconnect because I/O Interconnect "hired and paid Shine for its transportation services related to the Counterfeit Nike Footwear, and then provided a myriad of fraudulent information" including the identity of the Chinese shipper, the contents of the shipment, and the identity of the consignee.  Pl.'s Reply 9-10.  But the latter contention — that Shine was "working in concert" with I/O Interconnect — is wholly unpersuasive.  A "concerted action" is one "that has been planned, arranged, and agreed on by parties acting together to further some scheme or cause, so that all involved are liable for the actions of one another."  *Concerted Action*, Black's Law Dictionary (11th ed. 2019).  Here, Nike fails to identify any facts showing that Shine *knew* about I/O Interconnect's registration of the fraudulent domain name; at most, Nike contends that Shine was negligent in this regard.  *See* Pl.'s SoF ¶ 102 ("Shine never did anything to verify the email and telephone number it[] passed on to Hana."); *see also* Defs.' Resp. ¶ 104 ("Shine ha[d] no independent knowledge" that the phone numbers were the same).

Accordingly, the Court denies Nike's motion with respect to the presumption of willfulness on its Lanham Act claims.  To be clear, the Court decides only that Nike is not entitled to summary judgment as to a presumption of willfulness.  Nike may still attempt to prove at trial that Shine acted willfully as to its surviving Lanham Act claims, either through evidence that Shine was working in concert with I/O Interconnect to register the fraudulent domain name pursuant to Section 1117(e) or through some other evidence of willfulness.  *See* 15

U.S.C. § 1117(e) ("Nothing in this subsection limits what may be considered a willful violation under this section."); *see also Omega SA*, 984 F.3d at 258 (applying the Lanham Act's damages provision to a claim for contributory infringement).

## B.  Tariff Act Claim

Count VII alleges a claim for importation of counterfeit goods under the Tariff Act, pursuant to 19 U.S.C. § 1526.  *See* Compl. ¶¶ 121-27.  Section 1526 provides that "it shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise . . . bears a [registered] trademark owned by a citizen of, or by a corporation or association created or organized within, the United States" and that "[a]ny person dealing in any such merchandise may be enjoined from dealing therein . . . and shall be liable for the same damages and profits provided for wrongful use of a trademark."  The Second Circuit has held that a mark holder may "pursue private remedies against the importer" under this provision. *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 71 (2d Cir. 1987).

Nike argues that Shine is liable under Section 1526 because Shine "arranged and/or caused the transportation and importation of the Counterfeit Nike Footwear" and this "establishes that Shine is 'a person dealing in such' counterfeit merchandise."  Pl.'s Mem. 27. Nike cites in support *Eastern Ports*, where the Court concluded that an NVOCC in China and its agent in the United States, also an NVOCC, were liable under Section 1526 because they "were actively involved in the importation of counterfeit goods" by arranging the transportation of the goods.  2018 WL 3472628, at *9.  Shine asserts that it is not liable, but it offers little in the way of an argument with respect to why.  Defs.' Mem. 24; Defs.' Opp'n 22-23.

Despite Shine's limited response, the Court concludes that there is a genuine dispute of fact as to whether Shine itself was the one to "import" counterfeit merchandise or whether it was

"dealing in" counterfeit merchandise.  Shine was not the consignee of the shipment or even the customs broker, parties that would more obviously be understood as "importing" the shipment. *Cf. U.S. Sun Star Trading, Inc.*, 2010 WL 2133937, at *5 (holding the consignee of a shipment of counterfeit cigarettes liable); *Deckers Outdoor Corp. v. Huang*, No. 15-CV-04772 (AMD) (RER), 2017 WL 1842556, at *2-4 (E.D.N.Y. Apr. 20, 2017) (same), *report and recommendation adopted*, 2017 WL 1854728 (E.D.N.Y. May 5, 2017).  Moreover, it is not clear that Shine benefited in any way from "dealing" in the counterfeit goods beyond being paid to ship them as it would be paid to ship any other goods.  *Cf. In re Houbigant Inc.*, 914 F. Supp. 964, 982 (S.D.N.Y. 1995) (denying dismissal where the defendants did not directly import goods but "were responsible for and beneficiaries of an illegal scheme to sell counterfeit goods in the United States"); *Disenos Artisticos E Industriales, S.A. v. Work*, 676 F. Supp. 1254, 1271 (E.D.N.Y. 1987) (denying a distributor's motion for summary judgement because "[a] distributor clearly 'deals' in merchandise and thus may be liable under the statute"); *Liu*, 489 F. Supp. 2d at 1122-23 (finding the defendant liable where he had "unloaded and transported some cargo which . . . turned out to be counterfeit cigarettes," and also concluding that the defendant "willfully blinded" himself to the counterfeits).  To the extent *Eastern Ports* is to the contrary, the Court is not persuaded that an NVOCC that unknowingly arranged transportation of counterfeit goods but played no other role in their importation or sale should be held liable. Accordingly, the Court denies both parties' motions with respect to Nike's Section 1526 claim. Nike may attempt to prove at trial that Shine played a role in the counterfeiting scheme that would lead a reasonable factfinder to believe that Shine "import[ed]" or "deal[t] in" the shipment.  19 U.S.C. § 1526.

**C.  New York Law Claims**

Finally, Counts VIII, IX, X, XI and XII of Nike's Complaint allege New York common law claims, including trademark infringement, trade dress infringement, trademark dilution, unfair competition, and unjust enrichment.  *See* Compl. ¶¶ 128-151.  All of these claims fail as a matter of law.

First, Nike's claims for trademark and trade dress infringement and unfair competition fall short for several reasons.  Nike itself contends that its federal and state claims rise or fall together, Pl.'s Mem. 28, and the Court has already concluded that Nike's federal claims for direct infringement fail as a matter of law.  If anything, Nike's arguments are even weaker under state law because "[u]nfair competition claims under New York common law that otherwise resemble Lanham Act claims do not require that the allegedly infringing mark be 'used in commerce' as defined by [15] U.S.C. § 1127."  *Can't Live Without It, LLC*, 287 F. Supp. 3d at 417.  Thus, Nike's arguments regarding the word "transported" in Section 1127 simply do not apply to its state law claims.  And finally, Nike does not cite (and the Court has not found) any decision holding that New York common law makes an unwitting transporter of counterfeit goods liable for infringement or applying a theory of contributory trademark infringement.  Accordingly, the Court grants Shine's motion for summary judgment as to Nike's common law claims for trademark infringement, trade dress infringement, and unfair competition.

Second, Nike's state-law dilution claim also fails.  To state a claim for dilution under New York law "a plaintiff must first possess a trademark or name which is truly of distinctive quality or one which has acquired a secondary meaning in the mind of the public" and must also show "likelihood of dilution."  *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir. 1983) (citation and emphasis omitted).  Likelihood of dilution, as with a federal claim, can be

shown where the defendant "blur[s] a mark's product identification or . . . tarnish[es] the affirmative associations a mark has come to convey." *Id.* Here, as with the federal claim, Nike has not shown that Shine was selling counterfeit goods in a way that was likely to blur or tarnish Nike's mark because Shine is not alleged to have sold goods at all. Accordingly, Shine's motion for summary judgment as to dilution under New York law is also granted.

Finally, although Shine moves for summary judgment on all of Nike's claims, including unjust enrichment, Defs.' Mem. 25, Nike's brief offers no argument as to that claim. Accordingly, the Court concludes that it has been abandoned. *See, e.g.*, *Cui v. Fed. Bureau of Investigation*, No. 19-CV-2904 (MKB), 2021 WL 3163249, at *6 (E.D.N.Y. July 26, 2021).

## CONCLUSION

For the forgoing reasons, Nike's motion for summary judgment is DENIED, while Shine's cross-motion for summary judgment is GRANTED in part and DENIED in part. More specifically, the Court rules as follows:

- Nike's direct-infringement claims under Sections 1114 and 1125(a) of the Lanham Act must be and are dismissed because Shine, as a mere transporter of the goods at issue, is not strictly liable under those provisions of the Lanham Act;

- There is a genuine dispute of material fact with respect to whether Shine knew or should have known that I/O Interconnect and/or IO Innovative were shipping counterfeit goods and, thus, Nike's claims for contributory infringement under Sections 1114 and 1125(a) of the Lanham Act cannot be dismissed;

- So too, there is a genuine dispute of material fact with respect to whether Shine imported or dealt in counterfeit goods within the meaning of the Tariff Act, 19 U.S.C. § 1526, precluding summary judgment on that claim;

- Nike's similar claim under Section 1124 of the Lanham Act must be and is dismissed, both because there is no private cause of action for violation of that provision and because it is duplicative of the Tariff Act claim;

- Nike is not entitled to summary judgment with respect to whether a presumption of willfulness applies to its Lanham Act claims under Section 1117(e) of the Act; and

- Nike's dilution claims, under federal and state law, and its other state-law claims fail as a matter of law and, thus, must be dismissed.

Unless and until the Court orders otherwise, the parties shall have sixty days from entry of this Opinion and Order to complete discovery on damages.  *See* ECF No. 52.  Within thirty days of the close of such discovery, the parties shall submit a proposed joint pretrial order and associated materials (in accordance with Section 5 of the Court's Individual Rules and Practices in Civil Cases, available at https://www.nysd.uscourts.gov/hon-jesse-m-furman).  After reviewing the parties' submissions, the Court will schedule a pretrial conference to discuss the procedures for and timing of trial in light of the COVID-19 pandemic.

In the meantime, the Court is of the view that the parties should try to settle this case without the need for an expensive trial.  To that end, the parties shall promptly meet and confer to discuss settlement and advise the Court if there is anything the Court can do to facilitate a resolution without trial, such as referral to the assigned Magistrate Judge for settlement purposes or referral to the Court-annexed mediation program.  If the parties agree that a settlement conference would be appropriate, they shall promptly advise the Court and seek an appropriate extension of the pretrial deadlines.

The Clerk of Court is directed to terminate ECF No. 63.

SO ORDERED.

Dated: September 30, 2021
     New York, New York

JESSE M. FURMAN
United States District Judge